IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) CRIMINAL NO. 3:13-cr-207-JRS |
| RAHIM SABADIA, | ) |
| *Defendant.* | ) |

## STATEMENT OF FACTS

The parties stipulate that allegations contained in Count One of the Criminal Information in this matter and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt:

1. In the 1980s, the defendant, RAHIM SABADIA, founded a company that he named Sabtech. Sabtech specialized in developing and manufacturing advanced communication systems and components, and providing customer training and service for those systems and components. Nearly all of Sabtech's contracts were with the United States Department of Defense.

2. As of July 13, 2010, SABADIA and Sabtech no longer held active security clearances with the U.S. government, both of which were essential for Sabtech to be able to continue bidding and working on one type of U.S. military contracts it had specialized in.

3. So that he could continue working on the same type of government contracts that Sabtech had previously held, SABADIA devised a plan to create a separate corporation that would contract with the government and outsource some of the actual work to Sabtech. On March 3, 2011, at the defendant's direction, a new company called Primary Tech Systems (PTS) was incorporated. SABADIA chose what would be the three officers of PTS, all of whom would also be owners. He also chose a fourth owner of PTS. All four individuals were chosen because of a different ability or characteristic he/she would bring to PTS.

4. The three officer/owners were employees of SABADIA's at Sabtech, one of whom had good relations with U.S. Navy procurement officials at Naval Surface Warfare Center (NSWC), Dahlgren, Virginia, which managed a contract Sabtech previously held to supply technical support and services for the Navy's Aegis Ballistic Missile Defense System. The fourth owner (who was not also an officer) was a relative of SABADIA's. SABADIA influenced the three PTS owner/officers to contribute $1,000 to initially capitalize the company.

5. In discussions with Navy officials, PTS officers did not hide the fact that some of the actual work for any contracts the Navy awarded to PTS would be performed by Sabtech. SABADIA's role vis-à-vis PTS was explained as that of a mere advisor and subcontractor, and that he was not someone who exercised any operational control over PTS or its officers.

6. In reality, SABADIA exercised control over PTS. Several incidents are illustrative of SABADIA's influence over PTS and its officers. On April 4, 2011, in a conversation with one of his hand-picked PTS officers who spoke to the defendant of taking PTS in a direction that he [SABADIA] did not approve of, the defendant essentially instructed the officer to desist in his actions, and further informed the officer that he [SABADIA] was in control of the company. On April 7, 2011, this same PTS officer had a conversation with a second PTS officer, who had called the first officer at the direction of SABADIA. The second officer told the first officer, in so many words, that they needed to respect SABADIA's vision for PTS. In an email on April 26, 2011, a PTS officer asked SABADIA for guidance on a particular issue, stating, "tell us how you want to proceed." On May 12, 2011, during a meeting of SABADIA and the PTS officers, the defendant proclaimed that he saw Sabtech and PTS as "still one business."

7. In the spring of 2011, PTS's officers were engaged in negotiations with the U.S. Navy to bid on a small training materials contract, the successful completion of which would enable PTS to compete for larger contracts. SABADIA's ultimate goal was for PTS to obtain the services contract that Sabtech had lost when it lost its facility clearance. Navy officials made it clear to PTS officers early in the negotiation process that because SABADIA no longer held a security clearance he could have no control of PTS in order for PTS to be eligible to obtain the contract.[1]

---

[1] On November 1, 2011, PTS submitted a proposal for the services contract that

8. On June 16, 2011, SABADIA had a telephone conversation with a procurement officer at NSWC Dahlgren regarding his role with PTS. SABADIA described being an advisor to PTS. He further stated that he could not fire anyone from PTS, and could not make decisions on behalf of PTS or anyone there. The procurement officer asked SABADIA twice if he was controlling or directing any of PTS business activities, to which the defendant responded "nothing...nothing." In point of fact, these statements were false, as the defendant well knew at the time, and provide the basis for the charge set forth in the Criminal Information filed in this case.

9. On March 16, 2012, Special Agents with the Federal Bureau of Investigation conducted a voluntary interview with the defendant at NSWC Dahlgren. During the interview, the defendant admitted that he had created PTS, which he acknowledged was his "brainchild," as a workaround to continue doing business with the Navy after he and Sabtech lost their security clearances. SABADIA admitted that on multiple occasions he exercised control over PTS and its officers that exceeded the role consistent with only a mere advisor, and SABADIA told the agents, "I shouldn't have done that."

---

Sabtech previously held with the Navy.

10. The actions taken by the defendant as described above were taken willfully, knowingly, and with the specific intent to violate the law. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

DANA J. BOENTE
ACTING UNITED STATES ATTORNEY

By: _____
Brian R. Hood
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RAHIM SABADIA
Defendant

I am RAHIM SABADIA's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Paul W. Butler, Esquire
Counsel for Defendant