FILED
2014 MAR 19 P 1: 26
US DISTRICT COURT
RICHMOND, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

CRIMINAL NO. 3:13-cr-207

v.

Sentencing Date: March 20, 2014

RAHIM SABADIA,

## ANSWER TO DEFENDANT'S RESPONSE TO VIRGINIA HAMMOND'S MEMORANDUM IN AID OF SENTENCING

This Memorandum is respectfully submitted by the non-party, VIRGINIA HAMMOND ("Hammond"), to assist the Court in determining an appropriate sentence, concerning the Defendant's guilty plea to one count of making false statement in violation of 18 U.S.C. 1001, and appearing before this Court for sentencing on March 20, 2014.

The undersigned, hereby submits probative evidence in opposition to Defendant's proposition that his wrongful conduct was an aberration inconsistent with his true character, values, and personal ethics.

1

## A. PRELIMINARY STATEMENT

The undersigned will not entertain any ad hominem remarks propounded by the Defendant, and does not improperly requests that this Court addresses the merits of litigation or issues not subject to its jurisdiction[1]. In an effort to present this Court, with objective evidence about the character, history and prior criminal history of the Defendant, Hammond has limited to address her personal recollection to a succinct sworn statement and paragraph in her initial Memorandum. (pages 21-23). Therefore, the vast majority of her filing cites verbatim records from government entities, sworn trial testimony, and other materials that are not creation of the undersigned, therefore, the Defendant wrongly asserts that some of the allegations and documents included are false.

As it was previously anticipated, the undersigned will not be present in the sentencing proceedings, due to her lack of financial resources to fund the commuting from her out-of-state place of residence. However, should this Court necessitate her testimony in any regard but not limited to the veracity of information previously submitted, Hammond will exert all efforts to honor the requests of this Court.

Particularly with focus on the Defendant's assertions set forth on his Response, he states that in connection with the action brought against his communication specialist Alan Hilburg, "the consultant acknowledged that his allegation of perjury was untrue and was made only to obtain payment he felt Mr. Sabadia owed him". R. 2. Once more, Sabadia misleads this Court. The allegation of perjury against Sabadia was existed, as it can be evidenced by the actual email the consultant drafted. Ex. 11. Perhaps, the Defendant attempts to convey that upon the

---

[1] Therefore it is irrelevant to this proceedings to consider whether the alleged loan documents between Sabadia and Hammond were intentionally forged by Sabadia's brother in law to later seek their enforcement onto the undersigned.

2

filing of the legal action, the consultant later took the position that he was not in possession of evidence demonstrating perjury against Sabadia, as he had perviously stated in his email to his adversarial parties. Notably, the Defendant alleges presumably with supportive evidence (unknown to the undersigned) that Hilburg sent the email asserting perjury against Sabadia "only to obtain payment he felt Mr. Sabadia owed him"; to the extent that Hilburg falsely alleged to have had possession of perjury evidence in the context multimillion dollar legal malpractice jury trial in order to obtain moneys from Sabadia, then such conduct may be construed as extortion in violation of 18 Section 875 (d) United States Code. Undoubtedly, a high profile sophisticated image consultant had no reason to extort money from Sabadia, and he did not. The facts are clear, on June 18, 2012 Hilburg drafted the email asserting to have "knowledge *of possible perjury*", on July 23 Sabadia sued, and later on September 5, 2012 the parties had confidentially settled their differences. But the fact remains that Hilburg was undeniably in possession of perjury evidence in context of the highly publicized jury trial.

## B. FINE AND PROBATION. CORRECTION OF FACTS

On its Memorandum the government states that "there should be no dispute that the defendant's conduct is serious, and should be sanctioned appropriately with probation and the hefty, agreed-to fine". G.M. 8. Further, "to the extent that protection of the public from the defendant's future criminal conduct is required, a sentence of three years' probation and a $25,000 fine should be adequate" Id.

It is unclear whether the government is aware of the wealth possessed by Rahim Sabadia, amassed through his commercial endeavors with United States defense agencies; because if the prosecution were to be aware of the dimension of his wealth, it could not possible consider the sum of twenty five thousand dollars

($25,000) to be a "hefty" sum. The proposed fine is preposterous, and minimal in comparison with the wealth of the criminal defendant.

The following is a summary of the assets owned by Rahim Sabadia, pursuant to his signed "Personal Financial Statement" submitted to Enterprise Bank on March 31, 2009. Ex. 19,:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $2,504,000 | State and Fed Tax | $800,000 |
| Personal Residence | $1,450,000 | Other | $100,000 |
| Other Real Estate | $14,300,000 | | |
| IRA's Keoghs, Plans | $240,000 | | |
| Sabtech Industries Inc. | $4,000,000 | | |
| Sabadia Family Limited P. | $2,500,000 | | |
| Assets | $24,994,000 | Liabilities | $900,000 |
| Net Worth | $24,094,000 | | |

| Income | |
|---|---|
| Wages and Salaries | $250,000 |
| Bonuses, Commissions, etc | $750,000 |
| Interest and Dividends | $50,000 |
| Partnership Draws | $1,000,000 |
| Total Cash Income | $2,050,000 |

4

In addition, a year after the aforementioned financial statement, in 2010 the Defendant subscribed to the IRS Offshore Voluntary Disclosure Initiative, and repatriated previously undisclosed overseas funds, causing a tax liability in the range of 10 to 12 million dollars[2], according to the Defendant's own testimony. Ex 5. p. 19.

Sabadia knowingly concealed to the Internal Revenue Service the existence of the offshore funds prior to 2010, in addition to having had deportation proceedings held against him in 1977, and an indictment in 1985; additionally on January 20, 1988 Sabadia sued the U.S Small Business Administration for breach of contract, and in 2011 sought again to skim the government out of 10 million dollars worth of services without the required security clearance.

Conclusively, the Defendant had a net worth of $24,094,000 and annual income of $2,050,000 as of 2009, without accounting for the later repatriated funds; the jury verdict (and partial settlement) obtained against the law firm Holland & Knight for the sum of $34,496,779.92 on April 19, 2012,; and the proceeds of sale of Sabtech Industries Inc., on or about December 6, 2013.

The Defendant's net worth is conservatively estimated to be in excess of TWENTY FOUR MILLION NINETY FOUR THOUSAND DOLLARS ($24,094,000), while the monetary fine recommended by the prosecution is about ONE TENTH OF ONE PERCENT (0.1%) of the net worth accumulated by the criminal defendant. The undersigned, and the public in general will fail to

---

[2] Defendant's counsel holds that "Mr. Sabadia has satisfied by payment in full" his debt to IRS. PSR page A-1. However, outstanding unpaid liens appear to still exist in concept of Federal Tax Lien, in the Orange County tax records in regards to Defendant's liability.

5

comprehend the punishment and deterrent effect of such minimal monetary fine.[3] It is therefore disconcerting when the government states on its Memorandum that "the nature of the offense and the defendant's economic means call for punishment that exceeds the mere wrist-slap of probation alone" GM. 6. Because such negligible fine goes beyond a wrist-slap, and it is ready to be construed as an actual reward to incur in criminality with gross impunity.

Moreover, the government on its Memorandum stated that TEN MILLION DOLLARS ($10,000,000) was the "value of the engineering services contract that Sabtech lost and which PTS, under Sabadia's direction, bid on in November 2011" GM 5. Further, it is stated "these contracts contain many provisions, including but not limited to security clearance requirements, to guard against fraud, ensure that the government receives what it has bargained for, and protect *our national security*".

To be sure, according to the stipulated facts and plea agreement, Sabadia sought to defraud the United States for the sum of $10,000,000, and in doing so he misrepresented facts to government officials compromising the procurement process, and "our national security". The relevancy and offense of Sabadia's criminal acts concerns a matter most delicate extending beyond any pecuniary considerations, being the security of this nation.[4]

---

[3] Arguably the proposed fine will not affect Sabadia's principal capital, as the fine could be easily paid with a fraction of the interest generated by his cash deposits.

[4] While Sabadia claims to have aided homeless veterans, and Navy representatives testified as to Sabadia's service to the Navy and durability of the products. DM. 9-10. it is evident that simultaneously Sabadia had no second thoughts on setting up PTS and attempting to defraud the United States in a massive scale. Evidently, the Defendant has not helped the community in the same financial scale in that he has sought to defraud the United States.

6

The government has also recommended a probation sentence of 3 (three) years. The recommended probation equals the time served by Sabadia in 1985 when sentenced in violation of Title 18, Section 2512(1)(b), United States Code. Then, Sabadia sold wire tapping equipment to an undercover FBI agent, who purportedly bought the equipment to bug a union meeting. Although, pursuant to the Defendant's recent testimony he was merely selling "baby monitors" and "didn't have to serve the probation". <u>Ex. 3. p. 19, 20, 21</u>. This Court should not consider the recommendation of imposing the identical probation sentence against Sabadia, to which he had been previously sentenced after a seven (7) count indictment.

Evidently, the present action involves considerations of national security, and the incorporation of an alter-ego corporation to bid on services worth up to ten million dollars, in corruption of the procurement process by an individual with vast political and financial influence. Surely, this case bears no resemblance in seriousness with Sabadia's prior venture of selling wire tapping equipment, despicable crime as it was. Consequently, this Court should impose a much severe sentence, consisting of the incarceration of the Defendant.

## C. IMMIGRATION AND SECURITY CLEARANCE

On its Memorandum the government holds that Sabadia has been "generous to others with his time and money". <u>GM. 7</u>. However, the government seems to ignore that it was as a consequence of his generous "charitable contributions" that the Department of Defense Security (DDS) suspended Sabadia's clearance, as stated below in an email to Navy contracting officer Michael Schrantz dated July 14, 2010:

> "Re: Sabtech Engineering Services Contact Concern.
> What Rahim told me was DSS has questions about some of his "charitable contributions", but is all I know at this point" <u>Ex. 8. p. 2.</u>

To be clear, DDS considered in 2010 that at least some of Sabadia's charitable donations were incompatible with his security clearance, causing the suspension and giving rise to the actual reason that prompted Sabadia to form and operate Primary Tech Systems. In absence of the objectionable charitable contributions, Sabadia would not have had his security clearance suspended, ergo, PTS would not have been set up to circumvent the sanction. The charitable donations that were objectionable in 2010 in view of the DDS, are currently seen as part of Defendant's "laudable side" by the prosecution. Presumably not all of his charitable donations were subject to investigation and scrutiny of the Department of Defense, but the fact that a fraction of those donations were procured in an effort to secure his personal gain or against the interest of the DOD, should constitute sufficient reason to not construe his charitable activity as a laudable contribution to his character. [5]

Furthermore, the government also states on its Memorandum:

> "[Sabadia's] thoughtful personal statement to the U.S. Probation Officer, and his family's "Constitution" and "Strategic Plan" are indeed unusual. All of this describes one aspect of a personal history that *is truly commendable and which must be seen only rarely by a court in a criminal case*". GM. 7

The aforementioned statement is not objective, and plainly wrong.

Although undersigned (and the public) is not familiar with the nature of Sabadia's "thoughtful personal statements to the U.S Probation Officer", the government is wrong in commending any merit to Sabadia's efforts to impose a

---

[5] The prosecution in all good faith, seems to ignore the taxable effect of Sabadia's contributions. For an individual worth several million dollars, the tax-deductible nature of those gifts and donations constitute a great financial advantage contributing to the growth of his estate, regardless of the sponsored cause.

8

"family constitution" and a "strategic plan" for his family. There could be hardly anything commendable in those action, being that Sabadia was only following the estate planning techniques and methods suggested and applied by his advisors. In this regard, and mentioning his former estate planning attorney Mr. Ed Coss, the Defendant testified as follows:

> Q. Okay. And did he also help you with estate planning?
> A. He helped us. Actually, Ed-- This is where it was moving. It was moving in that direction; but first, we had to establish a family constitution. He laid out a--a sequence on how a path on how we should do this. *So he said, you know, first, we establish a family constitution. Then we'll establish a family strategic plan, and from there we'll decide how you want to organize your estate* or how you want to reorganize your estate planning or you want to reorganize it, but this--We'll revisit that at that time. (emphasis added)
> <u>Ex. 3 p. 38-39</u>

In short, Sabadia did not exert his own efforts to create a "constitution" and "strategic plan" for his family as consequence of his good character and care for the community. In applying his business judgment and to preserve his wealth, Sabadia's estate planning attorney suggested actions in accordance with his expertise, including but not limited to creating various family trusts, limited partnership, and other estate planning and tax avoidance structures, in addition to the creation of the "constitution" and "strategic plan" for the Sabadia family.

There is absolutely no merit (or impropriety), on the fact that Sabadia compensated his advisors and carried on with their planning recommendations,

9

hence this Court should not consider such acts as a "laudable" side of the Defendant's personality. [6]

Moreover, the government adopts the following statement in regards to Sabadia's immigration to this county.: "*He escaped the oppressive conditions* of South African Apartheid, traveled to Europe and the United States" .GM p. 6. This is not true, and the Court should not consider such argument in order to draw sympathy towards the criminal defendant. The truth of the matter was expressed by the District Director of the Department of Naturalization, Mr. William J. Chambers on May 23, 1977, in the context of the deportation proceedings of Rahim Abdur Noormohammed (a/k/a Rahim Sabadia), when stated that "the fact that you [Rahim Sabadia] followed your brother to Switzerland and obtained employment with the company for whom he was employed, and that after he came to the United States, started a business, filed an application for permanent residence in the United States *you joined him here indicates that your intention was to remain here*". Ex. 1. p. 96

Rahim Sabadia *did not escape an oppressive regime*, instead he planned and strategized to follow his brother to Switzerland to obtain employment there, and shortly thereafter put a scheme in motion to immigrate without the necessary legal requirement to the United States. This is further reinstated in the aforementioned decision, where the District Director states:

> "[U]sing the rationals implicit in the Matter of Sauer, 10 I&N, Dec. 177, *it can only be concluded that you [Rahim Sabadia] and your*

---

[6] As reflected in the PSR ¶¶ 52-59, the defendant stated he has enjoyed a level of financial prosperity that most people can only dream of achieving. Paradoxically, as sole result of Sabadia's oppression the undersigned has suffered a financial and health demise that similarly most people can only dream of in their worst nightmare.

10

*brother [Moosa Sabadia] did not enter the United States in good faith as nonimmigrants without the intention of circumventing the quota restrictions of the Immigration and Nationality Act, as amended.* (emphasis added) Ex. 1. p. 96

Appallingly, neither party to this action has mentioned the fact that deportation proceedings were commenced against Rahim Sabadia, (File No. A22 350 214) and that he was found to not have entered the United States in good faith. It is apparent that those proceedings were not included in the PSR.

## ARGUMENT

After having sold his interest in Sabtech Industries Inc., and without a requisite of restitution, by serving a probation sentence of three (3) years -equal to a prior sentence served for selling wire tapping equipment- and paying about one tenth of one percent of his net worth, Rahim Sabadia will not be placed in a position to never again commit a similar crime. In light of his political and financial might, and having corrupted the defense contract procurement process in severe detriment of national security, the recommended probation and fine is minimal and not according to the seriousness of the crime. Because no meaningful fine is required, Sabadia still possesses the bulk of a multimillion dollar empire, and does not requires of a license to continue his businesses, which he can freely manage through straw men and shell corporations to continue to outmaneuver the legislation and regulatory framework.

As it is sustained by the government and supported in evidence, Sabadia is a person of determination who is unafraid to violate the law for personal gain. Because "will cannot be quenched against its will", the Defendant is highly likely to incur in crime in the future. The Court should also consider the compounded risk of an individual of this wealth and the sensibility of his area of business. On 1985 Sabadia

11

was selling wire tapping equipment to bug union meetings, and was sentenced to three year probation; now the same individual has a net worth in excess of 20 million dollars seeking to defraud the United States for services over 10 million dollars, and the recommended sentence is absurdly the same three year probation.

If the Court adopts the recommended sentence and probation, it does nothing different than incentivizing a white collar criminal-minded individual to perfect its technique and incur in crime again, when it may be too late to deter him for a third time due to his already acquired knowledge of secret defense information, and the leverage of his massive wealth and influence. Rahim Sabadia should be incarcerated. This alone makes any prospect of recidivism highly unlikely. In the case *US v. Adelson*, 441 F. Supp. 2d 506 (Dist. Court, SD New York 2006) Judge Rakoff decried "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic" He noted the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." Indeed, the Sentencing Commission itself, in its 2004 study "Fifteen Years of Guidelines Sentencing," stated "that the Sentencing Guidelines were written, in part, to 'ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence."

## CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court impose a reasonable and principled sentence in this case, "sufficient, but not greater than necessary", however, firmly based on a punitive deterrent effect in accordance with the evidenced criminal recurrence, and the true character, values, and personal ethics of the Defendant.

Dated: March 19, 2014.

Respectfully submitted,

/s/ Virginia Hammond

VIRGINIA HAMMOND
Pro se.
553 McIntosh Loop.
Aiken, SC. 29805

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

CRIMINAL NO. 3:13-cr-207

v.

Sentencing Date: March 20, 2014

RAHIM SABADIA,

## CERTIFICATE OF SERVICE

I, Virginia Hammond, hereby certify that on the 19th of March, 2014, the foregoing non-party Memorandum in Aid of Sentencing was served on the following by electronic mail. This is to certify that the foregoing document was filed with the Court.

This 19th of March, 2014.

| Assistant United States Attorney | Jonah E. McCarthy |
|---|---|
| Brian R. Hood. U.S Attorney's Office | Akin Gump Strauss Hauer & Feld LLP |
| 600 East Main Street. Suite 1800 | 133 New Hampshire Avenue, N.W |
| Richmond, VA. 23219-2447 | Washington, D.C. 20036 |
| brian.hood@usdoj.gov | jmccarthy@akingump.com |

/s/ *Virginia Hammond*

VIRGINIA HAMMOND, pro se.
553 McIntosh Loop
Aiken, SC. 29805. Tel. 404-217-2109